UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


DONALD MARTINETTI,

                    Plaintiff,

v.                                    Case No. 3:13-cv-780-J-39JRK

MAJOR DAVIS, et al.,

                    Defendants.
_____

**ORDER**

**I. Status**

Plaintiff Donald Martinetti, an inmate of the Florida penal system, is proceeding in this action on his July 9, 2013 Amended Complaint (Doc. #5) (Amended Complaint) filed pursuant to 42 U.S.C. § 1983.  Martinetti names Major Davis, Sergeant Green, Nurse Martin, and Nurse Sealey, all employees at Columbia Correctional Institution Annex (CCIA), as Defendants.[1]  Martinetti asserts causes of action for "First Amendment Retaliation" against each Defendant.  Amended Complaint at 5, 7-9.  As relief, Martinetti seeks compensatory and punitive damages in addition to costs and

---

[1] The Court notes that "Major Davis" is now a Colonel and that "Sergeant Green" is no longer employed at CCIA.

attorney's fees.  Upon briefing by the parties, this Court denied Defendants' Motion to Dismiss Plaintiff's claim.  See Order (Doc. #31).

This cause is before the Court on Defendants' Motion for Summary Judgment and Memorandum of Law (Doc. #49) (Motion). Martinetti was advised of the provisions of Federal Rule of Civil Procedure 56, notified that the granting of a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and given an opportunity to respond.  See Summary Judgment Notice (Doc. #50). Martinetti responded.  See Response to Defendants' Motion for Summary Judgment (Doc. #57) (Response).[2]  Thus, this case is now ripe for review.

## II. Allegations in the Complaint

Martinetti alleges that he suffers from degenerative disc disease, impairing his ability to walk.  Amended Complaint at 2. He relies on a wheelchair for mobility.  Id.  In addition, he "requires access to various auxiliary aids and modified facilities[.]"  Id.  Martinetti alleges that Defendants retaliated against him for filing, pursuant to Title II of the Americans with Disabilities Act (ADA), and settling another lawsuit (ADA Suit) against the Secretary of the Florida Department of Corrections

---

[2] The Court will refer to the exhibits appended to Defendants' Motion as "D. Ex." and to the exhibits appended to Martinetti's Response as "P. Ex."

(FDOC).  Id. at 2-5.  Martinetti filed the ADA Suit on October 13, 2011 and stipulated to a settlement and dismissal of the matter on December 18, 2012.  Id. at 2-3.  Soon after this settlement, Defendants engaged in numerous adverse actions, subjecting Martinetti to retaliation in violation of the First Amendment.

Specifically, Martinetti summarizes that, following settlement of the ADA Suit, (1) when Martinetti informed Nurses Martin and Sealey that his wheelchair had several defects and brought it in for repairs, the nurses intentionally hammered and damaged it; (2) Nurse Martin filed a disciplinary report against him for "disrespect" because Martinetti asked who had damaged his chair, but Martinetti did not receive a copy of the report nor attended any hearing related to the report; (3) he was transferred from a cell with accessibility features to one without such features; (4) Martinetti was assigned duties, such as sweeping, that he could not complete and was then placed in disciplinary confinement for his failure to complete such duties; (5) Martinetti's medical and security passes were revoked without explanation or justification; (6) Martinetti was denied grievance forms; (7) Martinetti was not allowed access to his legal documents or grievance forms; (8) the new CCIA warden inspected Martinetti's locker and read his confidential communications with his attorneys; and (9) he was denied access to a handicapped accessible shower.  See id. at 3-10. Thus, Martinetti claims that Defendants violated his rights under

- 3 -

the First Amendment by their retaliatory actions.  For each claim,

Martinetti requests the following relief:

> i.        Compensatory damages;
> ii.       punitive damages; and
> iii.      costs and reasonable attorney's fees
> attendant with the prosecution of this action
> pursuant to 42 U.S.C. § 1988.

Amended Complaint at 7-10.

### III.  Summary Judgment Standard

The Eleventh Circuit set forth the summary judgment standard.

> Summary Judgment is proper when "there is no
> genuine dispute as to any material fact and
> the movant is entitled to judgment as a matter
> of law." Fed.R.Civ.P. 56(a).  The substantive
> law controls which facts are material and
> which are irrelevant.  Raney v. Vinson Guard
> Service, Inc., 120 F.3d 1192, 1196 (11th Cir.
> 1997).  Typically, the nonmoving party may not
> rest upon only the allegations of his
> pleadings, but must set forth specific facts
> showing there is a genuine issue for trial.
> Eberhardt v. Waters, 901 F.2d 1578, 1580 (11th
> Cir. 1990). ...
>
> As we've emphasized, "[w]hen the moving party
> has carried its burden under Rule 56[], its
> opponent must do more than simply show that
> there is some metaphysical doubt as to the
> material facts ... Where the record taken as a
> whole could not lead a rational trier of fact
> to find for the non-moving party, there is no
> 'genuine issue for trial.'" Matsushita Elec.
> Indus. Co. v. Zenith Radio Corp., 475 U.S. 574
> 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
> "[T]he mere existence of some alleged factual
> dispute between the parties will not defeat an
> otherwise properly supported motion for
> summary judgment; the requirement is that
> there be no genuine issue of material fact."
> Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
> 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
> Unsupported, conclusory allegations that a

> plaintiff suffered a constitutionally
> cognizant injury are insufficient to withstand
> a motion for summary judgment. <u>See</u> <u>Bennett v.</u>
> <u>Parker</u>, 898 F.2d 1530, 1532-34 (11th Cir.
> 1990) (discounting inmate's claim as a
> conclusory allegation of serious injury that
> was unsupported by any physical evidence,
> medical records, or the corroborating
> testimony of witnesses).

<u>Howard v. Memnon</u>, 572 F. App'x 692, 694-95 (11th Cir. 2014) (footnote omitted).

### IV. Defendants' Motion

In their Motion, Defendants contend that they are entitled to summary judgment because (1) Martinetti did not suffer any physical injury or request nominal damages, and (2) Martinetti cannot prove a First Amendment violation against any of the Defendants. Thus, Defendants argue that summary judgment must be granted in their favor. To support their motion, Defendants provide the following: (1) Martinetti's inmate record, D. Exs. A and B; (2) a CCIA document reflecting Martinetti's external movements, D. Ex. C; (3) a document reflecting the dates of employment of Defendants, D. Ex. D; (4) declarations of each Defendant and the Assistant Warden of CCIA Randall Polk (Polk), D. Exs. E, F, H, K, and L; (5) excerpts of depositions of Martinetti and Randall Polk, D. Exs. G and J; and (6) Martinetti's disciplinary report history and disciplinary report package, D. Exs. I and M.

Defendants provide internal documents reflecting Martinetti's housing assignments in comparison with Defendants' employment

histories to show the relevant times where Martinetti was housed in CCIA and the Defendants were stationed there.  Martinetti's inmate record reflects a release date of February 8, 2014 followed by supervision that ended February 21, 2015.  D. Exs. A and B. Martinetti's movement/transfer history reflects that Martinetti was housed at CCIA for the final nineteen months of his sentence, i.e. from July 23, 2012 to his conditional release on February 8, 2014. D. Ex. C.  As discussed previously, Martinetti's ADA Suit was settled on or about December 18, 2012, while Martinetti was housed at CCIA.  Defendants provide organizational work assignments reflecting that (1) Major Davis worked at CCIA from July 6, 2012 to February 15, 2013 (two months after the settlement); (2) Sergeant Green worked at CCIA from March 30, 2012 to April 12, 2013 (four months after the settlement); (3) Nurse Martin worked at Columbia Correctional Institute (CCI)[3] from December 27, 2010 to September 15, 2013 (nine months after the settlement); and (4) Nurse Sealey worked at CCI from November 9, 2012 to May 24, 2013 (five months after the settlement).  D. Ex. D.

Defendants further provide declarations of Polk, a former colleague of the Defendants, and from the Defendants themselves. In his declaration, Polk explains that, while at CCIA, Martinetti was only assigned to a cell without wheelchair access for a single

---

[3] It appears that medical staff at CCI treated inmates at both CCI and CCIA.

minute and was never actually placed in that cell, attaching a document showing Martinetti's internal movements.  D. Ex. E.  Polk further explains that a Housing Officer makes dorm and bed assignments and Major Davis was never a Housing Officer at CCIA. Id.  The attached document also shows that Martinetti was assigned the task of "houseman" for most of his time at CCIA and that Martinetti was placed in administrative confinement five times and disciplinary confinement twice, once in May 2013 and then in October 2013, both after Defendants Davis and Green had left CCIA. Id. at 7-8.

Defendant Davis corroborates Polk's assertions, similarly stating that while he was a Major at CCIA from July 2012 through February 2013, he was not a part of the cell or work assignment process and did not assign or require Martinetti to sweep the floors.  D. Ex. F.  Davis further states that he was unaware of Martinetti's ADA Suit and did not give or direct anyone else to give Martinetti a disciplinary report, as prison records show that Martinetti did not receive any disciplinary reports during Davis' tenure.  Id.  In his declaration, Defendant Green also states that he never served as the Housing Officer and did not assign inmates to dorms or beds at CCIA.  D. Ex. H.  Defendant Green was never permanently assigned as a confinement sergeant and only served in that role sparingly, on three or four separate occasions to cover for the permanent confinement sergeant.  Id.  Green states that he

never refused to give Martinetti grievance forms, when requested, and could not have retaliated against him because he did not know about Martinetti's ADA Suit. _Id_. Green states that the Institutional Classification Team assigned Martinetti the task of houseman, and Green performed his duty to make sure that Martinetti performed his task, which medical advised was proper. _Id_. Green states that he does not recall giving Martinetti a disciplinary report for refusing to sweep the floors, but that he may have issued a disciplinary report after medical told him that Martinetti was able to sweep. _Id_. Green finally explains that Martinetti believed he did not have to comply with CCIA rules because of his disability, relating a story where Martinetti became very confrontational and upset with Green when he instructed Martinetti to combine his belongings into a single locker, per prison rules, although Martinetti had incorrectly told Green that he was allowed two lockers on account of his disability. _Id_.

The Defendant nurses provide similar accounts. Defendant Martin states that, as a Senior Licensed Practical Nurse at CCI, employed by FDOC from 2010 to 2013, she did not work on damaged wheelchairs, but would sometimes look at the damage and refer it to the appropriate staff member. D. Ex. K. She states that she did not ever attempt to repair or bang on Martinetti's wheelchair, but did evaluate it for damage. _Id_. Martin did not know about Martinetti's ADA Suit and did not ever tell anyone, including nurse

- 8 -

Robinson, to write a disciplinary report for Martinetti as she would write her own reports if she saw an inmate violate the rules. Id. Defendant Sealey was employed by FDOC from 2005 to 2013 as a Registered Nurse, and was a Registered Nurse Supervisor at CCI from October 2012 until May 2013. D. Ex. L. Sealey states that, as a supervisor, she did not have frequent interaction with inmates and did not remember Martinetti, but reiterated that problems with wheelchairs were referred to CCI staff. Id. Sealey further states that she did not ever attempt to repair a wheelchair and that Defendant Martin, her subordinate, was always professional to inmates. Id. Finally, Sealey explains that she always wrote her own disciplinary reports and did not ever order other staff to do so. Id.

Defendants also provide excerpts of depositions of Polk and Martinetti as well as Martinetti's disciplinary report history. In his deposition, Polk explains that the ADA Suit was never discussed at any staff meetings. D. Ex. G at 2. He further states that he and his staff regularly check for the availability of grievance forms and that inability to get them is "a very, very rare occurrence" as they are available in confinement, the law library, general housing, and can be printed off the prison website by staff. Id. at 3. After reviewing his records, Polk relates that Martinetti was probably known as a "writ-writer," a frequent grievance filer, by staff and inmates because he filed 321 formal

grievances at CCIA, and then 77 grievances during his short time at CCI, but that he did not receive any different treatment by prison staff.  Id. at 4-5.  Polk does admit that one of Martinetti's grievances states that it was late because grievance forms were unavailable, but then Polk follows up stating that his staff check, at least weekly, to ensure their availability, as required by the prison's accreditation body.  Id. at 5-8.  Polk finally states that Martinetti's housing would have four different staff positions throughout the day, with a minimum of eight total through a 24-hour period, all of whom would have to refuse Martinetti a grievance form to make them unavailable.  Id. at 9-10.

The excerpts from Martinetti's deposition reflect his frustration with how he was treated.  Martinetti states that, when he complained to Defendant Martin about a broken wheel on his wheelchair, she took it into another room where he heard banging. D. Ex. J at 2-3.  Then, Martin brought the chair out and claimed it was fixed, although "the housing had marks.  She had taken the chair leg, the footrest, and used it as a hammer to bang the housing on to hold the piece in place so that it didn't fall out for five minutes.  It lasted halfway back to the dormitory."  Id. at 3.  Martinetti further claims that she got another nurse, Nurse Roberson, to write a disciplinary report about him. Id...Martinetti claims that Defendants Martin and her supervisor Sealey said there was nothing wrong with his wheelchair but then

took it and beat it, laughing.  Id. at 3-4.  Martinetti explains, though, that he "had no real exposure with Nurse Sealey ... [n]ever really had any good or bad contact with her."  Id. at 4.

As for Martinetti's disciplinary report history during his time at CCIA, Martinetti received three disciplinary reports, one for disrespect to an officer on April 24, 2013, and two for disobeying an order, on September 25 and 29, 2013.  D. Ex. I.  As punishment, he received 30, 15, and 30 days of disciplinary confinement, respectively.  Id.  The document showing Martinetti's internal movements, attached to Polk's declaration, reflects approximately twenty-nine days of confinement for the first incident, and forty-four days for the second and third incidents.  See D. Ex. C at 7-8.  Martinetti's first disciplinary report was written by Nurse Roberson for cursing at her and general disrespect regarding his wheelchair and is confirmed by other officers in the area, but Martinetti argues that he was not disrespectful, did not curse at any female officer, and instead had discussions with Defendants Martin and Sealey, not Nurse Roberson, finding support from another inmate's statement.  D. Ex. M.

Based on this evidence, Defendants first argue that Martinetti's claim must fail because he did not receive any physical injury, as required by the Prison Litigation Reform Act (PLRA).  Without a physical injury, an inmate can only seek nominal damages, but Martinetti's Amended Complaint does not seek such a

remedy.  Thus, Defendants urge that Martinetti has failed to state a claim.

Next, Defendants admit that Martinetti's prior litigation is constitutionally protected but still argue that the evidence does not support a claim against any of the named Defendants.  As for Defendants Davis and Green, Martinetti has alleged violations of his rights based on his (1) transfer to an ADA inaccessible housing assignment, (2) assignment to sweep the floor, which he was unable to do, resulting in disciplinary action, and (3) denial of access to grievance forms.  Motion at 12-16 (citing Amended Complaint at 5-8).  As for the Defendant nurses, Martin and Sealey, Martinetti has alleged that the two nurses intentionally damaged his wheelchair in retaliation for Martinetti's lawsuit, although he admits the he did not directly observe the damage because the nurses took the wheelchair into another room.  Amended Complaint at 9-10; D. Ex. J at 38.

Defendants point out that, due to Defendant Davis' limited employment at CCIA, ending on February 14, 2013, none of the claims can be sustained against him.  For instance, Martinetti's housing records show that he was never given an inaccessible housing assignment and that his new assignment did not occur until after Defendant Davis had left.  D. Ex. E at 1-2, 7.  Polk explained that Defendants Davis and Green did not have any authority over Martinetti's housing assignment.  D. Ex. E at 2.  Further, during

Defendant Davis' employment, Martinetti did not receive any disciplinary reports. D. Ex. I.

While Defendant Green admits he did assign Martinetti the task of sweeping the floor, he claims that he did so because it was his duty to ensure all inmates were doing some type of work and medical staff informed him that Martinetti could still sweep the floor from his wheelchair, not in retaliation. D. Ex. H at 2. Defendant Green, however, contends that he did not give Martinetti a disciplinary report for refusing to sweep, as confirmed by CCIA's records indicating that Martinetti's only disciplinary reports for refusing an order occurred either prior to Martinetti's settlement or after Green's departure from CCIA. D. Ex. I. Moreover, Defendant Davis alone could not have entirely denied Martinetti grievance forms because (1) Martinetti was never in confinement during Davis' tenure, (2) seven other security staff members would also have had to deny Martinetti the forms, and (3) Martinetti filed 500 grievances and 321 formal grievances during this time. D. Ex. G at 9-14, 44. Finally, Green could not have denied the grievance forms to Martinetti in confinement because he was only assigned to confinement for three or four days. D. Ex. H at 1-2.

Defendants then point to Martinetti's deposition where he admitted that it was merely his inference and opinion that any damage done to his wheelchair by the Defendant nurses was retaliatory, which, they assert, is insufficient to support a

claim.  Motion at 17 (citing D. Ex. J at 38, 47, 49).  Defendants also point out that Martinetti admits that he had never had any interaction with Nurse Sealey and, thus, fails to provide any evidence of retaliation by her.  Motion at 17 (citing D. Ex. J at 42).  Defendants further state that the medical staff was not responsible for repairing wheelchairs, but would only refer such needs to FDOC staff.  D. Ex. K at 1-2.  Additionally, Defendants point out that the disciplinary report against Martinetti, that he alleged was written by Nurse Martin, was instead prepared by another nurse, Nurse Robinson, and Martinetti appeared and defended himself at the related hearing.  D. Ex. M at 1-2.

Finally, Defendants point out that Martinetti's allegations that his medical passes were revoked, that he was denied access to legal documents and attorneys, and that the new warden read his legal paperwork, do not implicate any of the named Defendants and, thus, cannot form the basis of his claims.  Motion at 19.

## V. Martinetti's Response

In response, Martinetti provides (1) a declaration of Martinetti; (2) an excerpt of a deposition of Polk's deposition in an unrelated matter;[4] (3) an April 11, 2013 charging disciplinary report against Martinetti; and (4) the full deposition of Martinetti.  P. Exs. A, B, C, and D.  In his sworn declaration,

---

[4] This August 30, 2013 deposition appears to be related to another case before this Court, Betancourt v. Florida Dep't of Corr., No. 3:13-cv-287-HES-JRK (M.D. Fla. Dec. 16, 2014).

Martinetti explains that he had previously been diagnosed with a degenerative disc condition affecting his spinal cord, which FDOC had determined required wheelchair usage.     P. Ex. A at 2. Martinetti summarizes the settlement of his ADA Suit and adds that, "[i]mmediately after the case was dismissed, I began to experience discriminatory actions by staff members at [CCIA]."  Id.  Due to defects in his wheelchair, Martinetti again claims that he informed Defendant Martin, who took it to another room where Martinetti heard a loud banging on metal before the wheelchair was returned but was very difficult to steer.  Id. at 3.  Martinetti claims that Nurse Sealey supervised Defendant Martin and did nothing to stop her from sabotaging his wheelchair.  Id.  Martinetti further claims that he was in medical two days later and was confronted by Defendant Martin.  Id.  When he responded that the wheelchair was still not working and needed to be serviced by a certified technician, she told an officer that Martinetti was being disrespectful, and the officer took him to confinement.  Id. Martinetti further explains that he did receive a disciplinary report from Nurse Krystle Roberson, but did not have any interaction with her, indicating that her allegations were false. Id. at 3-4.

Martinetti then explains that, while he had a shower seat and wand in his prior dormitory, after the ADA Suit settlement, he was moved to a dormitory without access to either.  Id. at 4.

Additionally, Martinetti adds that, although he had a medical pass
in 2012 and 2013 stating he could not push or pull objects or lift
more than ten pounds and was not required to work, "[s]hortly after
the settlement, Major Davis instructed Captain Nipper and Sergeant
Green to put me to work.   Sergeant Green told me that I was to
sweep the dayroom."   Id.   Even though Martinetti attempted to
explain his inability to sweep, Defendants were unmoved and
Defendant Green gave Martinetti two or three disciplinary reports
for refusing to work.   Id.   Although Martinetti claims these
reports were "thrown out," he still claims they resulted in his
temporary placement in administrative confinement, with an
incidental loss of privileges and theft of personal property.   Id.
at 5.

Martinetti makes similar claims against Defendant Davis,
stating that, after the ADA Suit settlement, Davis' demeanor
changed, he used abusive speech, and was no longer interested in
the accessibility of the facilities.   Id.   He claims that,
referencing the ADA Suit, Davis told him, "[w]ell, they didn't do
anything for all that bullshit that you filed, Martinetti.   See,
they didn't do anything.   Nothing's changed[,]" clearly
demonstrating Davis' knowledge of the ADA Suit settlement.   Id.
Martinetti further claims that Martin knew about the ADA Suit
because "she was standing behind me while I was talking to an
individual in the medical records office about my obtaining of

injunctive relief.  This was prior to her damaging my wheelchair."
Id.  Martinetti also adds that, although not included on his
disciplinary report history, Green did write him a disciplinary
report on April 10, 2013, which is attached to his Response as
Exhibit C.  Id. at 6.  He further disputes Green's assertion that
he lacked knowledge of the ADA Suit or that they had any discussion
about medical allowing Martinetti to work.  Id.

Martinetti concludes his declaration explaining an injury he
received falling out of his wheelchair in the bathroom on or about
June 20, 2013.  Id.  He claims that, after Martin and Sealey
damaged the wheelchair, the

> "front wheels of the wheelchair became
> separated from the wheelchair frame.  The
> separation of the wheels from the chair caused
> me to fall out of my chair.  After this fall
> onto the floor of the bathroom, I experienced
> severe pain in my left hip that was much worse
> than it had been before."

Id.  At some time after his February 8, 2014 release, Martinetti
had both of his hips replaced by Dr. Stephen Naide, who Martinetti
claims "insisted on replacing the left hip first because it was in
far worse condition."  Id.

Martinetti provides an additional disciplinary report that was
not included by Defendants and for some reason did not appear on
Martinetti's disciplinary report history.  Cf. P. Ex. C with D. Ex.
I.  It details with an incident between Martinetti and Green:

> On April 10, 2013 I, Sergeant D. Green was
> assigned as O-Dormitory Housing Supervisor, as

- 17 -

> of 11:33AM, when recall was announced, inmate
> Martinetti, Donald DC#949485 has refused to
> work his assigned job as houseman (sweeping
> dayroom).    Since  I  first  instructed  and
> ordered Martinetti on March 13, 2013 as to
> what his duties were and to do the job [sic].
> Every morning, I have never seen Martinetti
> perform  these  duties.    This  in  direct
> violation of FAC Chapter 33-601.314 Rules of
> Prohibited Conduct 9-16 Refusing to Work or
> Participate in Mandatory Programs.  Shift OIC
> was  notified  and  authorized  this  report.
> Inmate Martinetti will remain in his current
> open population status pending disposition of
> this report.

P. Ex. C at 1.  There is no information provided regarding the

occurrence of any hearing or adjudication of this disciplinary

report.   It appears that Green left CCIA two days after this

incident, on April 12, 2013.  See D. Ex. D

In his deposition, Martinetti recounts much of the same

incidents described in his Amended Complaint and declaration.

Martinetti states that everyone, especially Davis, knew about the

ADA Suit because, "we talked [about it] constantly[; ...] It was

the gossip of the institution."  P. Ex. D at 43-44.  Martinetti

states that he would discuss the suit, filings, settlement, and ADA

requirements with many people throughout CCIA.  Id. at 45.

Martinetti explains that Davis' demeanor changed after

settlement of the ADA Suit, and he told his subordinates to make

Martinetti work and moved the wheelchair repair location to make

Martinetti go a long distance.  P. Ex. D at 11-31.  Because of this

new work assignment, which Martinetti claims he could not complete

- 18 -

and should not have been assigned due to his medical pass,
Martinetti claims that Green issued him two or three "bogus"
disciplinary reports for refusal to work. Id. at 13. Martinetti
further claims that Green was generally harassing, kicking his
bunk, trying to provoke Martinetti, making him last in line, and
trying to force him to work. Id. at 35-37.

Martinetti then claims that Martin treated him, and other
inmates, poorly, acting as "the cut-off point lady," restricting
access to doctors and refusing to document medical requests or
reasons for denial. Id. at 37-38. Martinetti recounts his
allegations that Martin banged on his wheelchair in another room,
which damaged or sabotaged it further, and then had him locked up
with a disciplinary report prepared by another nurse, Nurse
Roberson, who was not present. Id. 38-41. Martinetti further
explains that his wheelchair, which was only about two months old,
was initially damaged during transport from Dade Correctional
Institute, where the van did not have proper structures to secure
the wheelchair, and the frame was bent. Id. at 45-47. Regarding
the nurses' retaliation, Martinetti explains:

> They made jokes: Oh it's fixed now. Oh
> there's nothing wrong with that wheelchair.
> Sure, just go on, go ahead.
>
> I mean, harassment, how can I define it?
> Demeanor, snide remarks. What the actual
> remark was, they might have been very pleasant
> at the time, with a big smile on their face,
> knowing I'm not going to get five feet before
> I have to bend over, causing myself

> unnecessary pain, lifting the frame up,
> putting the wheel back into the housing and
> going another five feet, and repeating this
> all the way up and down the compound, every
> time to the chow hall, for two months.
>
> I just can't see any other reason.

<u>Id</u>. at 50-51.

Martinetti denies he made any rude remarks or cursed and denied ever meeting Nurse Roberson. <u>Id</u>. at 40. Martinetti explains that Sealey was Martin's supervisor and did not stop Martin. <u>Id</u>. Martinetti contends that the disciplinary report and proceeding was a sham, that Nurse Roberson falsely wrote the report as she wasn't there, that the guard who was there lied to support the report, and that such actions were taken at Martin's behest. <u>Id</u>. at 39-41. Martinetti claims that Martin regularly would threaten to "lock him up" for asking questions about his wheelchair to such an extent that he would not go to medical if she were there. <u>Id</u>. at 41-42. When questioned about how he knew that Martin's banging on his wheelchair was intentional retaliation rather than her best attempt to fix the chair, Martinetti responded:

> How could that possibly by – okay, here.
> First of all, if you have an individual that's
> working for the Department of Corrections in
> the medical field and is unaware of what the
> actual procedure is for maintaining and fixing
> a wheelchair, then you have a serious problem.
>
> How would I know that?  It's common sense.
> This person is in a supervisory situation
> position, and beating a wheelchair with the

> chair leg, does that sound like any type of
> procedure anywhere deemed appropriate in any
> situation?. ...
>
> Everything they did to me was retaliation
> after the lawsuit was settled.  They singled
> me out for every type of harassment they could
> deem.
>
> How do I know?  Nobody knows for sure, because
> you can't climb into somebody's brain and
> separate their thoughts and put them in the
> folder files and know exactly what they're
> doing, but things changed after the lawsuit
> was settled.   Things got worse after the
> lawsuit was settled.  Individuals singled me
> out after the lawsuit was settled.  Martin,
> the chair, Davis, working, Sergeant Green,
> working.
>
> I mean, how do I know for sure that this was
> retaliation?  What else could it possibly be?
> How could you possibly deem it anything other
> than retaliation?

Id. at 48-49.

Martinetti further describes three incidences of confinement based on a "bogus DR" in a non-ADA compliant confinement cell, lacking grab bars.  Id. at 54-56.  Martinetti also recounts a time where Sealey sought to check him for ulcers, which Martinetti found objectionable and was "locked up" for noncompliance, during which time his personal items were stored and half of them were stolen even though the disciplinary report was withdrawn.  Id. at 56-57. Martinetti also complains that, after the settlement of the ADA Suit, prison staff revoked his passes that allowed him to go inside to use the restroom at any time.  Id. at 60-61.  Further, Martinetti says that, for a time, he was moved to open bay housing

that lacked a shower wand or any ADA-compliant shower so that he had to shower sitting in his wheelchair until his last thirty days of confinement. Id. at 62-64. Martinetti then explains that he injured his left hip, twice falling out of his wheelchair on the sloped ground in the bathroom because a wheel fell off his damaged wheelchair, increasing his pain and heightening his need for a hip replacement. Id. at 66-71.

Based on this evidence, Martinetti disputes Defendants' "allegations"[5] that (1) Martinetti was never assigned to an inaccessible bed; (2) grievance form's were always available to Martinetti; (3) Green merely ordered Martinetti to work as part of his duties, but rather in retaliation for the ADA Suit; (4) Green never issued Martinetti a disciplinary report for "refusing to work;" (5) Martin or Sealey tried to repair the wheelchair because they, in fact, intentionally sabotaged it; and (6) that the altercation regarding Martinetti's wheelchair involved Nurse Roberson instead of Martin. Response at 1-3.

Martinetti further argues that summary judgment is inappropriate because (1) he suffered a physical injury as a result of Martin and Sealey's actions; (2) even had he not established a physical injury, nominal damages are available even without having been pled; and (3) Martinetti has provided evidence to support his

---

[5] While framed by the parties as allegations, admissions, and denials, the Court will construe them as argument regarding the existence of disputed issues of fact.

claims of retaliation against each Defendant.   Response at 4-14.
First, Martinetti points to his declaration and deposition to show
that he suffered a physical injury, falling out of his wheelchair
and injuring his left hip, caused by Martin and Sealey's
retaliatory damage and refusal to fix his wheelchair.   Id. at 4.
Next, Martinetti argues that nominal damages are available even if
not plead, citing Kelly v. Curtis, 21 F.3d 1544, 1557 (11th Cir.
1994); Gonzalez v. Sch. Bd. Of Okeechobee Cty., 571 F. Supp. 2d
1257, 1269 (S.D. Fla. 2008).   Id. at 5-6.

     Finally,  Martinetti  addresses  his  claims  against  each
Defendant.  As for Davis, Martinetti concedes that he cannot prove
Davis was involved with his transfer to non-compliant housing.   Id.
at  6.    Nonetheless,  Martinetti  argues  that  Davis'  change  in
demeanor after the ADA Suit settlement, disparaging language, and
direction  to  Green  and  other  subordinates  to  put  Martinetti  to
work,  prior  to  Davis'  departure,  was  the  impetus  for  continuing
retaliation  against  Martinetti  for  the  rest  of  his  confinement.
Id. at 6-8.  As for Green, Martinetti argues that his insistence on
making  Martinetti  sweep  and  subsequent  disciplinary  reports  for
"refusing to work," only began after the ADA Suit settlement and
evince a retaliatory intent.   Id. at 8-9.  Martinetti first argues
that  Green's  defense  that  he  did  not  give  Martinetti  a  disciplinary
report  is  "demonstrably  false,"  as  evidenced  by  the  Martinetti's
Exhibit C.   Id. at 9-10.   Martinetti next attacks Green's claim

that unidentified medical personnel told him that Martinetti could sweep is inappropriate to consider as inadmissible hearsay and, moreover, at best creates a genuine dispute of material fact. Id. at 10. Finally, Martinetti argues that Martin and Sealey's intentional sabotage of his wheelchair and subsequent disciplinary report were retaliatory. Id. at 10-12. Martinetti argues that it is immaterial whether he actually saw Martin and Sealey sabotage his wheelchair because he heard them banging on it, saw them laughing about it, and because it broke almost immediately after they handled it. Id. at 12. Martinetti argues that he has sufficiently shown that the ADA Suit settlement was the "but-for" cause, or subjective motivation, of Martin and Sealey's retaliation because the settlement was well-known at CCIA and there was a pattern of hostility in reference to it. Id. at 13. Finally, Martinetti argues that Martin and Sealey, by arguing in the alternative that even had they touched the wheelchair, they were attempting to fix it, attempt to improperly shift the burden of proof. Id. at 13-14. Instead, Martinetti argues that the nurses have the burden to show that they would have taken the same actions without the ADA Suit settlement. Id. at 14. Martinetti admits that he has not named or served other prison staff in this action but explains that he included them to show widespread knowledge of the ADA Suit settlement and subjective intent to retaliate generally within CCIA. Id.

- 24 -

## VI. Law and Conclusions

The Supreme Court has held that some First Amendment rights

> are simply inconsistent with the status of a
> prisoner or "with the legitimate penological
> objectives of the corrections system." We
> have thus sustained proscriptions of media
> interviews with inmates, prohibitions on the
> activities of a prisoners' labor union, and
> restrictions on inmate-to-inmate written
> correspondence. Moreover, because the
> "problems of prisons in America are complex
> and intractable," and because courts are
> particularly "ill equipped" to deal with these
> problems, we generally have deferred to the
> judgments of prison officials in upholding
> these regulations against constitutional
> challenges.

Shaw v. Murphy, 532 U.S. 223, 229, 121 S.Ct. 1475, 1479, 149 L.Ed.2d (2001) (citations omitted). However, "it is well established that a prison inmate 'retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" Al-Amin v. Smith, 511 F.3d 1317, 1333 (11th Cir. 2008) (quoting Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)).

In prison, the rights to free speech and to petition the government for redress of grievances are violated when a prisoner is punished for filing a grievance or lawsuit concerning the conditions of his imprisonment. Moulds v. Bullard, 345 F. App'x 387, 393 (11th Cir. 2009) (per curiam) (citation omitted); Douglass v. Yates, 535 F.3d 1316, 1321 (11th Cir. 2008); see also Bennett v.

Hendrix, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005) (adopting the standard that "[a] plaintiff suffers adverse action if the defendants allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights"), cert. denied, 549 U.S. 809, 127 S.Ct. 37, 166 L.Ed.2d 17 (2006).

"[T]he core of [a retaliation claim brought pursuant to 42 U.S.C. § 1983] is that the prisoner is being retaliated against for exercising his right to free speech." O'Bryant v. Finch, 637 F.3d 1207, 1212 (11th Cir. 2011) (per curiam) (citation omitted), cert. denied, 133 S.Ct. 445, 184 L.Ed.2d 272 (2012). For a retaliation claim, an inmate must establish that "(1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the administrator's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between retaliatory action and the protected speech." Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008) (citation and footnote omitted).

To establish causation, a plaintiff is required to do more than make "general attacks" upon a defendant's motivations and must articulate "affirmative evidence" of retaliation to prove the requisite motive. Crawford-El v. Britton, 523 U.S. 576, 600, 118 S.Ct. 1584, 1598, 140 L.Ed.2d 759 (1998) (citation omitted). "In other words, the prisoner must show that, as a subjective matter,

a motivation for the defendant's adverse action was the prisoner's grievance or lawsuit." Jemison v. Wise, 386 F. App'x 961, 965 (11th Cir. 2010) (per curiam) (citation omitted) (finding the district court erred by dismissing a complaint alleging retaliation with prejudice, "regardless of whether the retaliation claim ultimately [would have] merit").

Prison officials may not retaliate against inmates for filing lawsuits or administrative grievances. Wright v. Newsome, 795 F.2d 964, 968 (11th Cir. 1986) (per curiam). To establish subjective intent, a prisoner must provide more than conclusory assertions, possibly through a chronology of events that can be used to infer retaliatory intent. Williams v. Brown, 347 F. App'x 429, 435 (11th Cir. 2009) (finding conclusory allegations insufficient but officer's temporal reaction to a grievance sufficient to state a claim). However, because jailers actions are presumed reasonable, an inmate must produce evidence to support "specific, nonconclusory factual allegations that establish improper motive causing cognizable injury." Crawford-El, 523 U.S. at 598, 118 S.Ct. at 1596-97, 140 L.Ed.2d 759.

Finally, where a plaintiff makes a prima facie showing that constitutionally protected conduct was a substantial or motivating factor in a defendant's decision to take an adverse action against the plaintiff, summary judgment in favor of the defendant is still appropriate if the defendant can demonstrate that he would have

taken the same action even without such impetus.  <u>Mt. Healthy City</u>
<u>Bd. of Ed. v. Doyle</u>, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50
L.Ed.2d 471 (1977); <u>Crawford-El</u>, 523 U.S. at 593, 118 S.Ct. at
1594, 140 L.Ed.2d 759; <u>Mosley</u>, 532 F.3d at 1278.

Here, Defendants do not dispute that Martinetti's ADA Suit and
settlement constitute protected action, leaving only the second and
third elements, whether Defendants' actions would likely deter a
person of ordinary firmness from engaging in such speech and
whether such actions have a causal relationship with the ADA Suit
settlement.  Defendants have not argued or provided evidence to
suggest that they would have taken the same actions without the ADA
Suit, instead attacking Martinetti's prima facie case.

However, prior to addressing the underlying merits, the Court
reviews Martinetti's Amended Complaint to determine whether he has
properly plead damages.  While courts must grant a liberal
construction of <u>pro</u> <u>se</u> pleadings, <u>Erickson v. Pardus</u>, 551 U.S. 89,
94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing <u>Estelle</u>
<u>v. Gamble</u>, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251
(1976)), here, Martinetti is represented by counsel.  Defendants
have appropriately pointed out that Martinetti did not seek nominal
damages or allege a physical injury in his Amended Complaint,
instead only seeking compensatory and punitive damages.  <u>See</u>
Amended Complaint at 7-10.  Martinetti incorrectly claims that he
sought "all such other relief in law and equity as the court deems

just and proper." <u>Cf</u>. Amended Complaint at 7-10 with Response at 5.  The Amended Complaint does not include this or any similar request, but instead only seeks compensatory and punitive damages in addition to costs and fees.  Even were the Court to construe the Amended Complaint liberally, there is no indication whatsoever that Martinetti seeks nominal damages as he failed to include a general plea.  Rather, Martinetti seeks significant monetary damages, but does not allege a physical injury.

Because this case was filed while Martinetti was an FDOC prisoner, the PLRA restricts the damages that he could seek:

> Subsection (e) of 42 U.S.C. § 1997e states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  This statute is intended to reduce the number of frivolous cases filed by imprisoned plaintiffs, who have little to lose and excessive amount of free time with which to pursue their complaints.  <u>See</u> <u>Harris v. Garner</u>, 216 F.3d 970, 976-79 (11th Cir. 2000) (en banc) (surveying the legislative history of the PLRA).  **An action barred by § 1997e(e) is barred only during the imprisonment of the plaintiff; therefore such action should be dismissed without prejudice by the district court, allowing the prisoner to bring his claim once released and, presumably, once the litigation cost-benefit balance is restored to normal.**  <u>Id</u>. at 980.

> Tracking the language of the statute, § 1997e(e) applies only to lawsuits involving (1) Federal civil actions (2) brought by a prisoner (3) for mental or emotional injury (4) suffered while in custody.  In <u>Harris</u>, we decided that the phrase "Federal civil action"

means    all    federal    claims,    including
constitutional claims.   216 F.3d at 984-85.

<u>Napier v. Preslicka</u>, 314 F.3d 528, 531-32 (11th Cir. 2002)

(emphasis added), <u>cert</u>. <u>denied</u>, 540 U.S. 1112 (2004).

Martinetti responds, claiming for the first time in his
Response that he did suffer a physical injury and that, even if he
had not suffered a physical injury, he would still be due nominal
damages.   Response at 4-6.   Contrary to the Response, the Amended
Complaint does not allege a physical injury nor seek nominal
damages.

Martinetti attempts to reframe his claims into something other
than what was pled in the Amended Complaint.   Confusingly, in his
response, Martinetti insists,

> The Plaintiff has suffered physical injury as
> the direct result of the retaliatory actions
> of Nurses Martin and Sealey. ...   Although the
> Defendants assert that the specifics of the
> physical injury are not alleged in the
> Complaint, the Defendants had knowledge of
> Plaintiff's claims of physical injury and had
> the opportunity to conduct discovery regarding
> those injuries.   See Exh. D at 66:17 - 71:14.
> Therefore **summary judgment should not be
> granted simply because these physical injuries
> are not enumerated in the complaint** as a
> direct consequence of Martin and Sealey's
> tampering with the wheelchair.

Response at 4 (emphasis added).   Thus, in his Response, Martinetti
admits that he did not allege a physical injury in his Amended
Complaint.   Further, he improperly implies that, merely because
Martinetti mentions an injury in his deposition, that Defendants

could have properly taken discovery on issues outside of the
pleadings.  Again, the Court notes that the Amended Complaint was
not filed <u>pro</u> <u>se</u>, and, even if it were, would be difficult to
construe liberally to include any claim of physical injury.

This seems to be an attempt by Martinetti to improperly
reframe his claims to avoid summary judgment.[6]  This Court cannot
consider Martinetti's improper attempt to inject new issues in a
response to a summary judgment motion.  <u>Boone v. City of McDonough</u>,
571 F. App'x 746, 751 (11th Cir. 2014) (per curiam) (citing
<u>Miccosukee Tribe of Indians of Fla. v. United States</u>, 716 F.3d 535,
559 (11th Cir. 2013)) (holding that a new issue raised in response
to a motion for summary judgment without amendment to the complaint
was not properly before the court); <u>Gilmour v. Gates, McDonald &</u>
<u>Co.</u>, 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam) (holding
that plaintiff cannot amend a tort claim into a contract claim
through argument made in opposition to defendant's motion for
summary judgment).  Moreover, the submission of Martinetti's
deposition and argument in his Response does not change what was
pled in the Amended Complaint, which, on its face, neither alleges
physical injury nor seeks nominal damages.  Further, Martinetti has

---

[6] The Court notes that Plaintiff's counsel has previously been
reminded by this Court that such attempts are improper.  <u>See</u>
<u>Betancourt v. Fla. Dep't of Corr., et al.</u>, No. 3:13-cv-00287-HES-
JRK, slip. op. at 13-15 (M.D. Fla. filed Dec. 1, 2014).

not made any argument that Defendants Davis or Green caused him any physical injury.

While the pleading standard is not fully settled, it appears that a represented prisoner must either plead a physical injury or seek nominal damages explicitly in his complaint to state a claim. See Day v. Vaughn, 56 F. Supp. 3d 1377, 1383-85 (S.D. Ga. 2014) (following Aref v. Holder, 953 F. Supp. 2d 133, 149-50 (D.D.C. 2013) and holding that a represented prisoner's complaint with only a general prayer for relief is insufficient to be construed as a request for nominal damages); see also Olson v. City of Golden, 541 F. App'x 824, 828-29 (10th Cir. 2013) (finding inappropriate plaintiff's attempt to claim nominal damages "late in the day from [a] general prayer for relief and asserted solely to avoid otherwise certain mootness") (internal quotation omitted); Holloway v. Bizzaro, 571 F. Supp. 2d 1270, 1272 (S.D. Fla. 2008) (declining to construe liberally a pro se complaint that lacked a general plea for relief as seeking nominal damages where prisoner failed to allege physical injury); cf. Jackson v. Hall, 569 F. App'x 697, 699 (11th Cir. 2014) (per curiam) (remanding, in part, and directing the district court to consider whether the pro se prisoner's claims could be liberally construed to allow for nominal damages "despite his failure to request that relief"); Wilson v. Moore, 270 F. Supp. 2d 1328, 1332 (N.D. Fla. 2003) (construing liberally under Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972),

and limiting _pro se_ prisoner's complaint seeking compensatory and punitive damages without alleging physical injury as a request for nominal damages).  The cases Martinetti cites, Kelly v. Curtis, 21 F.3d 1544 and Gonzalez v. Sch. Bd. Of Okeechobee Cty., 571 F. Supp. 2d 1257, only deal with the general availability of nominal damages without physical injury.  They do not, however, deal with the issue presented in this case, i.e. whether a represented prisoner must request nominal damages in his pleading or may bring evidence outside of the pleadings in an attempt to defeat summary judgment or address pleading deficiencies.  In fact, in Gonzalez, nominal damages were explicitly requested in the complaint.  571 F. Supp. 2d at 1259.  Thus, Martinetti's Amended Complaint fails to state a claim because it neither alleges a physical injury nor seeks nominal damages.

Although not raised by Martinetti, the Court notes that Rule 54(c) allows a district court to "grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c).  Still, this is separate from the pleading standard.  Outside of cases noted above, the Court has not found a controlling or persuasive opinion considering a Section 1983 prisoner pleadings standard, in relation to the PLRA, and Rule 54(c).  However, the Court also notes that Rule

54(c) has its limits.[7]  Specifically, Rule 54(c) does not allow for

relief that is not sought in the pleadings "where the failure to

demand the relief ... prejudiced the opposing party."  Int'l

Harvester Credit Corp. v. East Coast Truck, 547 F.2d 888, 891 (5th

Cir. 1977)[8] (citing Sapp v. Renfroe, 511 F.2d 172, 176 n.3 (5th

Cir. 1975)) (finding prejudice and vacating district court's

rescission of a contract where parties had agreed the contract was

valid); Cioffe v. Morris, 676 F.2d 539, 542-43 (11th Cir. 1982)

(following International Harvester).  Similarly here, Defendants

were prejudiced by Martinetti's failure to plead a physical injury

or seek nominal damages, or even a general plea, in his pleadings.

Defendants had to rely on the pleadings through discovery and only

first received notice that Martinetti intended to seek nominal

damages in his Response.  This did not allow Defendants an

opportunity to seek discovery on these issues or make any argument

in response.  Moreover, Wright & Miller point out that Rule 54(c),

---

[7]  "[A]lthough Rule 54(c) itself does not place any restrictions on the type of relief that may be awarded in a nondefault case, stating only that it must be relief 'to which each party is entitled,' this does not mean that there actually are no limitations.  The relief must be based on what is alleged in the pleadings and justified by plaintiff's proof, which the opposing party has had an opportunity to challenge."  10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2662 (3d ed. 1998).

[8]  In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

read in conjunction with Rule 2, is designed to implement the merger of law and equity.  10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2662 (3d ed. 1998).  However, even in equity, the Court would have required a general plea in the ad damnum clause, which is lacking in Martinetti's pleadings.

Further, the Court notes other concerns with the Amended Complaint.  A defendant who occupies a supervisory position may not be held liable under a theory of respondeat superior in this action.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-92, 98 S.Ct. 2018, , 56 L.Ed.2d 611 (1978); Quinn v. Monroe Cnty., 330 F.3d 1320, 1326 (11th Cir. 2003); Farrow v. West, 320 F.3d 1235, (11th Cir. 2003).  Supervisor liability under Section 1983 will exist only if the supervisor personally participated in the events, or if there is a causal connection between the action of the supervising official and the alleged constitutional deprivation.  Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).  It is also important to clearly allege _the adverse actions of each defendant and the causal relationship between each defendant's allegedly retaliatory action and the protected speech.  Mosley, 532 F.3d at 1276.

"Dismissals of claims for monetary damages under 1997e(e) 'should be without prejudice to re-filing if and when the plaintiff is released.'"  Frazier v. McDonough, 264 F. App'x 812, 815 (11th Cir. 2008) (per curiam) (quoting Harris v. Garner, 216 F.3d 970,

980 (11th Cir. 2000) (en banc)).  As Martinetti has been released,
after dismissal of his claim based on the PLRA, he will be able to
re-file without any such damages limitation, so long as the statute
of limitations does not run.

Therefore, it is now

**ORDERED:**

1.    Defendants' Motion for Summary Judgment (Doc. #49) is
**GRANTED**.

2.    Martinetti's claims are **DISMISSED WITHOUT PREJUDICE**.

3.    The Clerk of the Court shall enter judgment in favor of
all Defendants and against the Plaintiff.

4.    The Clerk of the Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida this 18th day of
September, 2015.

_____
BRIAN J. DAVIS
United States District Judge

tc 9/14
c:
Counsel of Record

- 36 -